# Exhibit A

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF KENTUCKY
 2                      LEXINGTON DIVISION

 3  EQUAL EMPLOYMENT OPPORTUNITY    . Docket No. CR 11-358
       COMMISSION,                  .
 4                                  .
          Plaintiff,                . Lexington, Kentucky
 5                                  . December 8, 2011
          v.                        . 2:07 p.m.
 6                                  .
    NESTLE PREPARED FOODS,          . Show Cause Hearing
 7                                  .
          Defendant.                .
 8   . . . . . . . . . . . . . . . .

 9              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE ROBERT E. WIER
10      UNITED STATES DISTRICT MAGISTRATE JUDGE

11  APPEARANCES:

12  For the Plaintiff:    Ms. Aimee L. McFerren
                          U.S. Equal Employment Opportunity
13                          Commission
                          600 Dr. Martin Luther King, Jr.
14                          Pl.
                          Suite 268
15                        Louisville, KY 40202

16  For the Defendant:    Ms. Stephanie E. Lewis and
                            Mr. Andreas N. Satterfield, Jr.
17                        Jackson, Lewis LLP - Greenville
                          55 Beattie Place
18                        One Liberty Square, Suite 800
                          Greenville, SC 29601
19
    Court Reporter:       K. Ann Banta, RPR, CRR
20                        101 Barr
                          Lexington, KY 40507
21                        (502) 545-1090

22  Proceedings recorded by mechanical stenography,
    transcript produced by computer-aided transcription.
23

24

25
```

1 that fitness for duty exam, had him complete a
2 questionnaire that requested family medical history
3 information. And so --
4     THE COURT: That was not -- Dr. McLaughlin
5 was not his doctor, I presume.
6     MS. MCFERREN: Correct, that was not his
7 treating private physician.
8     THE COURT: Okay.
9     MS. MCFERREN: So during the course of the
10 investigation when that information was discovered,
11 the EEOC issued a subpoena requesting that Nestle
12 reveal the names of any other individuals who were
13 referred to Dr. McLaughlin for fitness for duty exams
14 as well as the identification of any other physicians
15 that they referred employees to for employment-related
16 exams.
17     And that's the information that they have
18 refused to supply.
19     And so it's the Commission's position under
20 the Genetic Information Non-Discrimination Act that
21 Nestle is in fact responsible for the actions of
22 physicians who conduct employment-related exams at
23 their behest.
24     THE COURT: And your theory for that is, is
25 it premised on the definition of employer as including

1 agent? Or tell me how you get to that.

2   MS. MCFERREN: Correct, Your Honor. If you
3 look at the statute, the term employer is actually
4 defined the same as it's defined under Title VII.

5   And that includes not only the primary
6 employer but those who are acting as an agent on
7 behalf of the employer.

8   THE COURT: Okay, and he is an agent why?
9 Tell me how he becomes an agent.

10   MS. MCFERREN: Well, at this point we have
11 not interviewed him.

12   We know very little about him in particular
13 or any of the other relationships they may have with
14 the physicians to whom they refer employees for work-
15 related exams.

16   But it's certainly possible that because the
17 employee had no say over whether or not that was the
18 doctor he was going to be sent to, it wasn't the
19 employee's own treating physician, the employee did
20 not pay for the exam, because of those types of
21 factors, that there was some sort of relationship, if
22 not contractual, then through agency or some other way
23 that employees were being referred to these physicians
24 for work-related exams.

25   THE COURT: And how would -- how would

1 looking for other instances involving this doctor or
2 other doctors at this facility, how would discovering
3 more about those things be relevant to Mr. Peel's
4 charge?
5         MS. MCFERREN: Mr. Peel's charge, we feel
6 that there is a violation of the statute in regards to
7 him.
8         And then flowing from there, looking for
9 other class members, there are other instances in this
10 circuit in particular where courts have enforced
11 administrative subpoenas looking for systemic type
12 information even though there is not a systemic
13 underlying charge.
14         THE COURT: Okay, so is that really the only
15 theory you are going on, that we have discovered a
16 violation as to Mr. Peel and so we should be entitled
17 to reasonably explore whether there are other victims
18 of the same type of violation at that plant?
19         MS. MCFERREN: Correct, if that is their
20 practice, referring employees to physicians for these
21 types of exams without giving any sort of guidance or
22 notice to the physicians that they are not supposed to
23 collect this type of information, it certainly is
24 possible that if it was done towards one employee from
25 one physician that it could be done towards other

1  employees as well; so yes, that is why I want to
2  explore that.
3         THE COURT:  Is the EEOC always entitled -- if
4  it finds one instance of discrimination, is it your
5  view that the EEOC is always entitled to a broader
6  probing to see if there are other similarly situated
7  victims of the same type of conduct?
8         MS. MCFERREN:  It's not something that we do
9  in every investigation by any means, but it's
10 certainly something that we are able to do if we feel
11 there is a systemic problem, if there is a practice, a
12 policy in place in particular where these things are
13 happening on a wide scale at a particular facility or
14 even company-wide, then yes, it is our practice to
15 look not just for the one individual but for a larger
16 remedy for other individuals because it's part of our
17 mandate in terms of the public interest.
18        THE COURT:  And what would suggest that there
19 is a systemic issue at Nestle?
20        MS. MCFERREN:  At this point we don't know.
21 We won't know that until we have the information, and
22 then we can determine whether or not that's the case.
23        No interviews have been conducted at this
24 point.
25        We don't do interviews until we have the

1       We are not relying on Section 1635(d) of the
2  regs to enforce the subpoena, period.  We are not.  We
3  don't make that argument.
4       The subpoena is premised on the fact that
5  GINA prohibits employers from requesting, requiring or
6  purchasing genetic information unless one of six
7  exceptions apply, and no exception permits employers
8  or doctors acting on their behalf to request genetic
9  information as part of the fitness for duty exam.
10      That's -- that's what we are basing the
11 subpoena on.
12      This whole extra argument about the regs and
13 the proposed regs, it's -- it's really a distraction,
14 quite frankly.
15      And it's interesting, I am more than happy to
16 brief those issues when I can do a written reply.
17      But, again, it's not what we are basing the
18 power of the subpoena on.
19      THE COURT:  Well, how do you respond to the
20 issue of the doctor relationship and Miss Lewis's
21 representation that he could have gone to his own
22 doctor, he could have gone to any doctor, "We just
23 referred him to this one," and that they have a true
24 doctor-patient relationship?
25      MS. MCFERREN:  First of all, the notion that

1  under the FMLA from their own physician, and it's
2  necessary to have larger -- a larger picture of the
3  medical information at issue.
4        It's not dealing with the situation where
5  there is a narrow fitness for duty exam, okay?  So
6  that doesn't even apply in this situation.
7        As far as what was known to Nestle at the
8  time of the charging party's employment, again,
9  looking back at the proposed regs that were in effect
10 since March 2009, it clearly stated, it warned
11 employers, come November 21st, 2009 things are going
12 to be different under GINA than what you have been
13 able to do under the ADA.
14       And it put them on notice that they were to
15 ensure that medical inquiries that they make or that
16 are made on their behalf, that they are done pursuant
17 to the requirements of GINA, so they did have notice.
18       THE COURT:  Well, what happens if in -- in
19 the Peel context, the supervisor perceives an issue
20 and says, "I am worried whether you can do this job,"
21 and says, "I want you to have a fitness for duty exam,
22 we have a doctor or you can go to your own
23 neurologist, your own doctor."
24       And Mr. Peel says, "I am going to my own
25 doctor."  Now, how does that change where we are?

1  MS. MCFERREN: Honestly I am not prepared to
2 answer that because I have not seen something like
3 that. It's a very good question.
4  But I would think in that sort of a situation
5 where the charging party is going back to their own
6 private physician, who already has not only probably
7 their family medical history but treatment records
8 from prior illnesses and surgeries, it's a different
9 context.
10  That information obviously is not going to be
11 shared with Nestle for any reason, okay?
12  THE COURT: Well, but sharing it's not been
13 your point all along.
14  MS. MCFERREN: I'm sorry?
15  THE COURT: Sharing it has not been your
16 point all along because it wasn't shared here.
17  MS. MCFERREN: But they were not acquiring it
18 for that specific purpose either.
19  It's something that they would already have,
20 presumably.
21  If it's your treating physician, they may
22 have a file 3 inches thick on you.
23  But you are not going to them -- if you are
24 going to them just for a fitness for duty exam, then
25 presumably the employer would look at the physician

1 description that they would receive from Nestle, I
2 assume, and just certify whether or not the employee
3 could perform those essential functions.
4     THE COURT:  But he is walking into the --
5     MS. MCFERREN:  And there would be no -- I'm
6 sorry.
7     THE COURT:  He is walking into the exam room,
8 he's been your doctor for twenty years, he's got a
9 file that thick (indicating).
10    MS. MCFERREN:  Uh-huh.
11    THE COURT:  He carries your -- he carries
12 your file in, as they always do, he is flipping
13 through it, talking to you, maybe he makes the
14 isolated assessment of yes, you can do this job or no,
15 you can't.
16    But really you can't say it's divorced from
17 his complete knowledge of your condition, and so
18 how -- how does Miss Lewis explain to her clients,
19 okay, in this context, this is going to be the rule,
20 the doctor is your agent.
21    In this context maybe the doctor is not your
22 agent, and how does she find in the law where to --
23 where to come down on that and explain it in a
24 rational way?
25    I mean, it seems like a nightmare for

1 employers to figure out how to stay out of liability.
2     MS. MCFERREN: I think you can look at what
3 the final reg says, and it says that when an employer
4 directs a health care professional to perform an
5 employment-related exam, that they need to make sure
6 they tell that employer not to request family medical
7 history, not to collect genetic information as a part
8 of the exam.
9     And that can be done if it's a -- if it's a
10 doctor that Nestle is referring an employee to for the
11 first time just for a fitness for duty exam or if it's
12 a -- a doctor that the charging party has used on
13 their own in the past and Nestle contacts them and
14 says, "Please do a fitness for duty exam as well."
15     They can go ahead and tell them the same
16 parameters and what's required.
17     THE COURT: Okay.
18     MS. MCFERREN: There -- but I mean, the
19 statute does provide for situations where it's --
20 where you are going to your physician for normal
21 medical treatment or for purposes of trying to figure
22 out an accommodation and then just those narrow
23 circumstances where it is a fitness for duty exam at
24 the employer's request; and that's what we are dealing
25 with in this case.

```
 1            THE COURT:  Okay, what else do you want to
 2   point out?
 3            MS. MCFERREN:  The other distinction, she had
 4   mentioned language about the safe harbor provision in
 5   the regs.
 6            Again, that does not even apply in this
 7   context.
 8            That has to do with a situation where there
 9   is perhaps an inadvertent acquisition of genetic
10   information.
11            Here there can be no argument of that because
12   the doctor directly asked for prohibited information.
13            So it was not an inadvertent disclosure, an
14   inadvertent acquisition.  It was something that was
15   done directly.
16            THE COURT:  Isn't inadvertence tied to
17   whether a notice of some type has been given to the
18   individual or the physician?
19            MS. MCFERREN:  Well, the physician was not
20   given the warning, the notice that he was supposed to
21   have been given from Nestle, so any liability would
22   flow to Nestle, not to the doctor directly.
23            THE COURT:  Right, I just mean in the safe
24   harbor.
25            Isn't that an element of it?  It's curious
```

1       So Miss McFerren, how much time would you
2  need?
3       And I am really thinking I would like it to
4  be 15 pages at the maximum.
5       MS. MCFERREN: Your Honor, 15 pages is fine.
6  Given the holidays, could I have until after the New
7  Year?
8       THE COURT: Well, you are the one wanting the
9  information.
10      I assume you are not in a bigger hurry than
11 that, Miss Lewis?
12      Okay, why don't we say -- I don't have my
13 calendar in front of me.
14      I'll pick a date sort of in the first -- 3rd
15 of January?
16      MS. MCFERREN: That's fine, Your Honor.
17      THE COURT: And then to reply I would want
18 that to be 10 pages or less, and if I give you two
19 weeks after she files her brief?
20      MS. LEWIS: Yes, Your Honor, thank you.
21      THE COURT: Miss McFerren, I would like -- I
22 would like you to tender as part of that a copy of the
23 fax request you talked about that went to
24 Dr. McLaughlin.
25      I would be interested to see what that looked